## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| In re: | |
|---|---|
| COMPRESSUS, INC., | Chapter 11 |
| Debtor. | Case No. 15-10670 (KJC) |

### DECLARATION OF WAYNE P. WEITZ IN SUPPORT
### OF CHAPTER 11 PETITION AND FIRST DAY MOTIONS

Under 28 U.S.C. § 1764, Wayne P. Weitz declares as follows under the penalty of perjury:

1.       I am a Managing Director of Gavin/Solmonese LLC ("**Gavin/Solmonese**"), which has been engaged as the proposed financial advisor to Compressus, Inc. (the "**Debtor**"). I am authorized to submit this declaration (the "**First Day Declaration**") on behalf of the Debtor.

2.       On April 6, 2015, the Debtor's board of directors informed me that Gavin/Solmonese had been selected as financial advisor to the Debtor. I then began coming up to speed on the Debtor and its business. On April 7, 2015, I arrived onsite at the Debtor's Washington, D.C. headquarters to begin preparing a budget in support of badly-needed post-petition financing. Since then, I have been working diligently to come up to speed on the operational, financial and restructuring issues that will be relevant to this chapter 11 case.

3.       The Debtor has also asked me to consider serving as the Debtor's Chief Restructuring Officer. I am considering undertaking such role, subject to bankruptcy approval and funding of sufficient post-petition financing to satisfy the Debtor's post-petition employee wage obligations and trust fund taxes and having sufficient authority to properly serve in such capacity. For now, Gavin/Solmonese is serving as financial advisor. Gavin/Solmonese did not perform any prepetition services for the Debtor.

4.      As part of my duties as the Debtor's financial advisor, I will be advising on its day-to-day operations, bankruptcy compliance, budgets, cash flows, financial analyses, potential asset sale, and overall restructuring or reorganization efforts.  Although I have been involved with this case for a short time, I have made myself generally familiar with the Debtor's financial condition, policies and procedures, day-to-day activities, and general books and records.  In that light, and except as otherwise noted herein, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from the Debtor's representatives or retained advisers. References to the Bankruptcy Code (as defined below), the chapter 11 process, and related legal matters are based on my understanding of such matters in reliance on the explanation provided by, and the advice of, counsel.  If called upon to testify, I would testify competently to the facts set forth in this First Day Declaration.

5.      On March 29, 2015 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief in the United States Bankruptcy Court for the District of Delaware (the "**Court**").  It is currently anticipated that the Debtor will continue to manage and operate its business as debtor in possession subject to the requirements of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "**Bankruptcy Code**").

6.      I submit this First Day Declaration on behalf of the Debtor in support of the Debtor's (i) voluntary petition for relief that was filed under Chapter 11 of the Bankruptcy Code and (ii) "first day" motions, which are being filed concurrently herewith (collectively, the "**First Day Motions**").[1]  The Debtor seeks the relief set forth in the First Day Motions to minimize the adverse effects of the commencement of the Chapter 11 cases on its day-to-day affairs and administration.  I have reviewed the Debtor's petitions and the First Day Motions, and it is my

---

[1] Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to them in the applicable First Day Motions.

belief that the relief sought therein is essential to, among other things, successfully maximize the value of the Debtor's estate.

7.    Part I of this First Day Declaration provides an overview of the Debtor's business, capital and debt structure, prepetition efforts to restore liquidity, and the events leading to the Debtor's Chapter 11 filings.  Part II describes the First Day Motions and sets forth the relevant facts in support of such motions.

## PART I

### Description of Business

8.    The Debtor is a healthcare software business with its flagship product being MEDxConnect™ Version 4.  The Debtor was organized in 2000 and is a privately held Delaware corporation with its headquarters at 101 Constitution Avenue, N.W., Suite 800, Washington, D.C. 20001-2133.

9.    The Washington D.C. headquarters is subleased from the American Council of Life Insurers for $20,000 per month, including common area maintenance charges.  The Debtor recently terminated its lease and vacated its engineering office that was located at 17731 Irvine Boulevard, Suite 114, Tustin, CA 92780-3206.  The headquarters is the Debtor's only remaining office space.  The Debtor owns no real property.

10.    The Debtor holds numerous patents and copyrights that underpin its MEDxConnect™ Version 4 software application that is the foundation for clinical business integration through the use of patient information across the healthcare organization. The Debtor's core intellectual property is based on autonomous routing, interoperability, work flow and image compression technology (hence the company name Compressus), and was originally designed to route time-sensitive medical images resulting from military field operations for the U.S. Air Force. The alpha product, then known as RadSight, led to Compressus securing five U.S. Patents and

three U.S. Pending Patents. In 2005, the Debtor entered into the development stage of its beta product, MEDxConnect™, with the goal of producing the world's first intelligent workflow solution for the healthcare industry. The Debtor launched the first generation of MEDxConnect™ in 2008 and has validated the software in the market.

11.     Although the Debtor initially deployed its MEDxConnect™ software as a radiology solution, it has since evolved into a more robust platform that connects the key systems throughout a healthcare organization that enable enterprise-wide interoperability, workflow management, and analytics capabilities. MEDxConnect™ provides the interoperability anticipated by the U.S. Affordable Care Act by allowing the information from legacy systems to be compiled together without degrading the performance of any single system. As a result, physicians, care givers and other healthcare decision makers can have the updated and relevant patient information they need in a format most appropriate for their diagnostic or analytic needs. The Debtor's customers have used MEDxConnect to improve productivity by 10% – 30%. The Debtor currently has MEDxConnect™ deployed at the Mayo Clinic.

**Events Leading Up to the Chapter 11 Cases**

12.     This chapter 11 case is the result, in large part, in the Debtor's inability to obtain additional funds from its equity investors or other sources in time to properly fund a comprehensive marketing strategy to deploy its MEDxConnect™ in a sufficient number of health care facilities to make the company profitable. All of the Debtor's cash previously obtained from equity investors and lenders under the convertible and non-convertible notes described below was used in the development and deployment of MEDxConnect™ and its continued improvement through the current Version 4. As cash began to run short, the Debtor attempted unsuccessfully to raise sufficient additional money though its existing investor and noteholder population and potential

other capital sources.  Although the Debtor has yet to become profitable, it ultimately ran out of cash when it was only a few new customers away from breaking even on a cash flow basis. Without sufficient cash to pay its employees or pay retainers to hire and pay professionals to prepare and file with its petition customary first day motions and applications, including post-petition financing, it was forced to file an emergency chapter 11 petition in order to get the protection of the automatic stay and to get professionals engaged in the process of rehabilitating the Debtor under chapter 11.  The first day motions are now being filed two weeks after the Petition Date.  Although this was a less than optimal path, the Debtor had no alternative without financing, and the only investors who would agree to loan to the Debtor would only do so on a post-petition basis with the protections of a Bankruptcy Court order.

### Selection of Professionals

13.    Bankruptcy Counsel.  During the week before the bankruptcy filing, the Debtor began interviewing law firms to serve as potential bankruptcy counsel and financial advisors to advise the company on restructuring issues.  Although a few days before the Petition Date, the Debtor had notified Sheppard Mullin Richter & Hampton LLP ("**Sheppard Mullin**") that it had selected it as its bankruptcy counsel, it was not until Sunday, March 29, 2015, that the Debtor formalized the engagement of Sheppard Mullin as proposed counsel to the Debtor.  The Debtor filed its voluntary chapter 11 petition shortly before 10:00 p.m. that night.

14.    Sheppard Mullin had previously served as counsel to the Debtor on certain general corporate matters, licensing agreements, presentations to the board of directors on corporate matters, litigation, documentation of certain (but not all) financing and equity transactions, an internal investigation arising from a defalcation by a former employee several years ago, and pre-bankruptcy advice in the few days ramping up to the filing.  As of the Petition Date, the Debtor

owed Sheppard Mullin approximately $370,000 that it could not pay. Accordingly, Sheppard Mullin agreed to waive its outstanding prepetition claim if its employment is approved. In addition, one of Sheppard Mullin's partners (Shon Glusky) had previously invested $25,000 in equity in the Debtor. Mr. Glusky has agreed to abandon, transfer back to the Debtor, or otherwise terminate his equity interest if Sheppard Mullin's employment is approved. Based on the qualifications, proposals, and interviews of the multiple firms that the Debtor considered, the Debtor selected Sheppard Mullin as its lead bankruptcy counsel and Gellert Scali Busenkell & Brown as local counsel. Sheppard Mullin received a $5,000 retainer to pay the chapter 11 filing fee and to cover a nominal amount of the fees incurred in preparing to file the petition. The remainder of Sheppard Mullin's prepetition fees will be waived if its employment is approved.

15.    Although the Debtor had interviewed multiple financial advisors prior to the Petition Date (on March 27, 2015), it was not until Monday, March 30, 2015, that the Debtor selected a firm (the "**Initial FA Firm**"). Yet the firm that was selected subsequently notified the Debtor that it was unable to arrive onsite until Friday, April 3, 2015 (five days into the chapter 11 case). Concerned that it needed a contingency, on Thursday, April 2, 2015 (four days into the case), the Debtor conducted in-person interviews of two other financial advisory firms (including Gavin/Solmonese). Ultimately, the Initial FA Firm arrived onsite on April 3, 2015, and then on Monday, April 6, 2015 (eight days into the chapter 11 case) announced that was unable to undertake the engagement. The Debtor immediately notified me that Gavin/Solmonese was selected as financial advisor. Accordingly, I came to this case eight days after it was commenced and was first onsite on the ninth day.

**Capital Structure**

16.    <u>Equity</u>. The Debtor has historically funded the development of its software with equity funding from what was initially a smaller group of investors. As the Debtor's cash needs grew over the years, it raised additional money through the issuance of both common and preferred stock. The initial shareholder group has grown to nearly 600 equity holders with total equity invested of nearly $80 million. There are both preferred and common stock outstanding as of the Petition Date. Virtually all of the outstanding equity interests are held by individuals, family trusts, or individuals' IRAs, and are thus non-institutional investors.

17.    <u>Note Debt</u>. The Debtor also borrowed money to fund the continued development, sales effort, rollout, and support of the various versions of MEDxConnect™. It did so by issuing non-convertible and convertible notes with certain of its existing equity holders and other individuals who were new to the Debtor's capital structure. Although nearly $30 million notes were issued, approximately $20 million of them converted to equity. The converted notes are included in the approximately $80 million of equity investment referenced above. That left just over $10 million of notes in principal amount outstanding as of the Petition Date. The accrued interest on such notes is approximately $3 million. Virtually all of the note debt is held by individuals, family trusts, or individuals' IRAs, and are thus non-institutional lenders. The list of the holders of the 20 largest general unsecured claims against the Debtor is largely populated by such holders.

18.    <u>Secured Debt</u>. Clifton Myers Enterprises, Inc. (defined as CME) is the Debtor's only material secured creditor. CME has provided engineering support and related services for the development and deployment of the Debtor's software. CME has recorded a security interest on the Debtor's intellectual property, software and non-ordinary course proceeds of same (the "**CME**

**Collateral**"), and is asserting a claim of approximately $4.1 million.  Yet there is not a consensus within the Debtor's organization regarding the allowable amount of the CME claim.  A thorough review of the claim will thus be conducted under my supervision.

19.    Trade Debt.  According to the Debtor's books and records, there is approximately $2.1 million in general trade vendor debt, not including the employee-related claims referenced below and the secured claim referenced above.

20.    Employee-Related Debt.  The Debtor has been suffering from a lack of liquidity for a significant period of time.  According to the Debtor's books and records that I have been shown, as of the Petition Date, there were approximately $1,125,000 in accrued and unpaid wages, $65,000 in unpaid employee expense reimbursements, and $119,000 in unpaid employee-related taxes, for a total of approximately $1,309,000 owing to (or related to) employees.  Both Sheppard Mullin and I have cautioned the Debtor and the Board that all wages and employee-related and other taxes must remain current on a post-petition bases or this case will be converted to chapter 7 or dismissed and other substantial ramifications may occur.

**Officers & Board of Directors**

21.    Laszlo R. Gasztonyi serves as the Chief Operating Officer.  Although three of the directors on the Debtor's board of directors (the "**Board**") recently resigned, the Board has five directors that remain active.  They are as follows:

| BOARD OF DIRECTORS | |
|---|---|
| Current | Recently Resigned |
| Thomas D. Campbell | Jim Sierk |
| Roger Willis | K. John Barr |
| John B. Macfarlane | Stephen Addington |
| Daniel B. Scherder | |
| W. Craig Kuhl | |

**Pending Litigation Stayed by the Chapter 11 Filing**

22.    I am aware of four pending lawsuits against the Debtor as of the Petition Date, which are subject to the automatic stay with respect to the Debtor.

a.    *Reynaldo Martinez v. Compressus, Inc., Thomas D. Campbell, and John B. Macfarlane*, United States District Court for the District of Columbia, Civil Action No 1:14-cv-00949 ABJ (action by co-founder of Compressus, Inc. for unpaid wages, work-related expenses, medical and dental expenses, premium payments, other monetary compensation, liquidated damages and penalties);

b.    *The Ingotwhe Trust v. Compressus, Inc.*, Superior Court of Delaware, in and for New Castel County, Civil Action No. N15C-02-149 WCC (note collection action);

c.    *Martin Faber, Trustee for the Martin and Adrienne Faber Trust U/A Dated November 21, 2005*, United States District Court for the District of Columbia, Civil Action No 1:15-cv-00280 GK (note collection action); and

d.    *Michael A. DeLuca, FBO Michael A. DeLuca Roth IRA*, United States District Court for the District of Columbia, Civil Action No 1:15-cv-00278 GK (note collection action).

**Anticipated Chapter 11 Process**

23.    The Debtor has spent tens of millions of dollars developing and deploying MEDxConnect™ Version 4, and the Board believes that the software application and its underlying intellectual property have substantial value that could significantly exceed the amount of the Debtor's debt. Because Compressus was a pioneer in this technology that is now coming of age because of the mandates under the U.S. Affordable Care Act, it was able to obtain early and broad patent protections that by themselves have substantial independent value according to the Board. As a result, this chapter 11 case is expected to proceed on the parallel paths of (i) testing the value of the company in the market place though a sale process, and (ii) a reorganization if the values are greater under a standalone plan of reorganization. The extent to which the Debtor

succeeds in its post-petition financing effort though both current investors and outside lenders will be a major factor in determining the outcome.

**Raising of DIP Financing**

24.     The Board has reported to me that after it became apparent that the Debtor was unable to obtain a conventional financing because the Debtor was not yet profitable and was unable to raise money through capital calls to its equity investors, a bankruptcy filing and post-petition financing would be the only viable means to keep the company operational so that the Debtor could maximize value for its creditors and other stakeholders.  The Debtor discussed the situation with its only material secured creditor, CME, and invited it to be a post-petition lender.  It would not.  The Debtor then asked whether CME would consent to being primed under a post-petition financing facility.  No agreement was reached.

25.     The Debtor next negotiated agreements with some of the directors on the Board and other non-Board investors in the Debtor to be participants in a post-petition loan to fund the company's effort to restructure its debts though a sale process or reorganization depending on which method would yield the best recovery for creditors and possibly shareholders if the values were high enough.  The strategy was to have the initial small group of directors and investors lend under an interim post-petition financing facility while inviting the remainder of the note holders and shareholders to also become participants in the facility.  This was intended to build a larger loan facility and to provide equal opportunities to all of these stakeholders.  I understand the Debtor has been discussing the opportunity with some of its investors beyond the initial group that committed $485,000.  This group is comprised of the following post-petition lenders in the indicated amounts:

| Name | Primary Relationship to Debtor | Commitment Amount |
|---|---|---|
| Marty Strauss | Equity holder | $300,000 |
| Daniel B. Scherder | Director and Equity holder | $100,000 |
| Steve Roberts | Equity holder | $55,000 |
| W. Craig Kuhl | Director and Equity holder | $10,000 |
| Bob Adams | Equity holder and employee | $10,000 |
| Roger Willis | Director and Equity holder | $10,000 |
| | TOTAL | $485,000 |

26.     The Debtor has scheduled a telephonic town hall presentation for its equity holders on Monday, April 13, 2015, to explain the chapter 11 process, the proposed post-petition financing facility, and the opportunity to be involved as a post-petition lender in the facility. The Debtor anticipates having at least $1 million in commitments during the week of April 13, 2015, and up to $4 million more by the final hearing on the post-petition financing motion that is being filed concurrently herewith. At a minimum, the Debtor has obtained the $485,000 lending commitment, which will bridge the Debtor until larger commitments can be obtained.

27.     On parallel paths with the Debtor's effort to obtain post-petition financing commitments, Gavin/Solmonese and Sheppard Mullin have been discussing potential transactions with their respective contacts in the DIP lender industry. At a minimum, I believe the proposed post-petition financing provided by the existing investors and directors will provide a bridge to a sufficiently larger facility. Given the ability to borrow and then repay the interim amount at a modest price under the circumstances (i.e., non-default interest rate of 12% with a prepayment fee of only a 3% greater interest rate on the daily interest with a two month minimum interest accrual), I believe is necessary and reasonable in light of the Debtor's dire financial situation. The alternative, which the proposed post-petition financing is intended to prevent, is the immediate termination of all employees, the shutdown of the business, a potential software maintenance disruption to the healthcare customers, a chapter 7 conversion, and the likely auction of the

intellectual property at some unknown time in the future.  In my opinion, such a result would harm CME, customers, the creditors and the other stakeholders.

## PART II

28.     As part of these cases, the Debtor is seeking approval of the First Day Motions and related orders (the "**Proposed Orders**").

29.     I have reviewed each of the First Day Motions, Proposed Orders and exhibits thereto (or have otherwise had their contents explained to me), and the facts set forth therein are true and correct to the best of my knowledge, information and belief.  Moreover, I believe that the relief sought in each of the First Day Motions (i) is vital to enabling the Debtor to make the transition to chapter 11 with minimum disruption and (ii) constitutes a critical element in the Debtor's being able to successfully maximize value for the benefit of its estates.

### Motion to Approve DIP Financing

30.     Central to the ability of the Debtor to continue to run its business and, therefore, preserve the value of its assets for the benefit of all stakeholders during the pendency of this chapter 11 case, is the Debtor's motion (the "**DIP Financing Motion**") for entry of interim and final orders (the "**Interim Order**" and "**Final Order**," respectively) pursuant to sections 105, 361, 363, 364(c), 364(d) and 507 of the Bankruptcy Code, Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure, and Rule 4001-2 of the Local Bankruptcy Rules for the District of Delaware, (i) authorizing the Debtor to obtain secured post-petition superpriority financing (the "**DIP Facility**") on an interim basis in accordance with the Interim Order and pursuant to the terms and conditions set forth in the various documents, including an Indicative Summary of Material Terms & Conditions attached to the Commitment Letter, dated April 9, 2015, which is attached to the proposed form of Interim Order as Exhibit A, (ii) authorizing the Debtor to execute and/or deliver all final DIP Loan Documents (as defined in the DIP Financing Motion), (iii) authorizing

the Debtor to draw on the DIP Facility, subject to the conditions precedent set forth in the DIP Loan Documents, and to use the proceeds of the DIP Facility to pay for, among other things, administration of this chapter 11 case, working capital and other general corporate purposes of the Debtor, in accordance with the 13-week budget which has been presented to the DIP Lenders, and as may be updated with the consent of the DIP Lenders (the "**Approved Budget**"), which is attached to the Interim Order as Exhibit B, (iv) authorizing the Debtor to seek further financing from additional potential DIP Lenders subject to the DIP Loan Documents prior to the Final Hearing, (v) authorizing the Debtor to provide CME with "adequate protection" to the extent of the validity, enforceability and perfection of its pre-petition secured liens, (vi) setting a final hearing (the "**Final Hearing**") to consider entry of a Final Order authorizing the balance of the credit available under the DIP Facility at the time of the Final Hearing, and (vii) granting such other and further related relief as outlined herein.

31. By the DIP Motion, the Debtor seeks approval from the Court to (a) borrow an initial amount of up to \$1,000,000,[2] subject to availability prior to the Final Hearing, immediately upon entry of the Interim Order, and (b) borrow an additional amount not to exceed \$4,000,000, subject to the ability of the Debtor to raise such amounts prior to the Final Hearing, immediately upon entry of the Final Order, from the DIP Lenders. The "**Maturity Date**" for repayment of the funds made available under the DIP Facility is the earliest of (a) September 30, 2015, (b) the date a sale of all or substantially all of the assets of the Debtor is consummated, (c) the effective date of a confirmed plan of reorganization for the Debtor as approved by the creditors of the Debtor and the Bankruptcy Court, (d) the conversion of the Case to a case under Chapter 7 of the Bankruptcy Code, (e) the dismissal or termination of the Case, and (f) the date of acceleration or

---

[2] The Debtor has secured commitments for up to \$485,000 in financing from the proposed DIP Lenders as of the filing of this Declaration.

the termination of the DIP Facility.  Repayment of the DIP Facility shall be made pursuant to the

DIP Loan Documents with interest accrued as follows:

| Scenario | Interest Rate |
|---|---|
| Repayment before maturity | 15% from date of funding to Effective Date with 60 days minimum interest. |
| Repayment at maturity | 12% |
| Plan confirmation with Effective Date before maturity | 18% from date of funding to Effective Date if both debtor and DIP Lender consent to conversion of debt to equity in reorganized Debtor.<br><br>12% from date of funding to Effective Date if paid in cash with 60 days minimum interest. |
| Plan confirmation with Effective Date after maturity | 18% from date of funding to Effective Date if both debtor and DIP Lender consent to conversion of debt to equity in reorganized Debtor.<br><br>If cash, the greater of (a) 15% from date of funding to Effective Date, and (b) 12% for period up to the maturity date and at 18% for period after the maturity date. |
| Default | 12% for each day prior to default and 18% for each day upon and after default. |

32.    As outlined in this Declaration and in the DIP Motion, the Debtor  is without

sufficient cash to operate its business or administer this case without the approval of the DIP

Facility.  More specifically, without the interim financing proposed by the DIP Motion, the Debtor

does not have the funds necessary to continue its operations or the administration of this chapter

11 case.  Accordingly, the Debtor's ability to continue its operations, to maintain business

relationships, to make current payroll, to pay the costs of administration of its estate and to satisfy

other working capital and operational needs, depends on obtaining immediate access to the DIP

Facility and the ability to use its cash, to the extent encumbered by any liens or other interests.[3]

---

[3] As explained in the DIP Financing Motion, it is my understanding that there are no parties who
are asserting or have a valid, enforceable or  perfected interest in the Debtor's cash or other

The access of the Debtor to the DIP Facility is vital for preserving and maintaining the going concern values of the Debtor. Failure to obtain the interim relief requested in the DIP Motion will immediately and irreparably harm (a) the Debtor, its estate, creditors and equity holders, and (b) the possibility of a reorganization or a different value-maximizing transaction.

33.    It is my understanding that the Debtor, given its dire condition and existing debt structure, was unable to find credit on any more favorable terms than those being agreed to by the DIP Lenders at the time of the filing of the DIP Financing Motion. Specifically, the Debtor was unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense or secured credit under sections 364(c) or 364(d) of the Bankruptcy Code on equal or more favorable terms than those offered by the DIP Lenders under the DIP Facility. Based on the representations made herein and in the DIP Financing Motion, I believe and could testify to the fact that the Debtor has made an adequate showing of its efforts to obtain financing under the circumstances on more favorable terms, including without limitation, by attempting to obtain financing from CME and other the existing creditors prior to the Petition Date.

34.    In addition to the granting of the DIP Liens (as defined in the DIP Financing Motion and the Interim Order), (b) the DIP Superpriority Claims (as defined in the DIP Financing Motion and the Interim Order), and (c) the other protections set forth in the Interim Order, the Debtor is offering an "Adequate Protection Package" to CME for the priming of its liens in the CME Collateral. This Adequate Protection Package is more fully described in the DIP Financing Motion, but includes certain "Adequate Protection Replacement Liens" and the grant of "Super-

---

operating accounts. The Debtor requests, in the DIP Financing Motion, the right to us any Cash Collateral to the extent encumbered, to supplement the funding to be made available under the DIP Facility.

Priority Claims" that are subordinate only to those of the DIP Lenders and subject to certain carve-outs.

35.    As a condition to the extension of credit under the DIP Facility, the DIP Lenders and the Debtor have agreed that proceeds of any advance made under the DIP Facility shall be used exclusively to pay certain costs relating to the administration of the Case and otherwise in a manner consistent with the terms of the DIP Facility and the Approved Budget, including for ordinary and necessary operating costs and expenses arising after the Petition Date or other payments as may be agreed to by the DIP Lenders, including without limitation, those payments contemplated under the Employee Obligations Motion (discussed below).

36.    I have reviewed the terms of the DIP Facility and believe that the terms and conditions of the DIP Facility and the DIP Loan Documents are fair, reasonable, and the best available to the Debtor under the circumstances, reflect the exercise of prudent business judgment by the Debtor consistent with its fiduciary duties, and are supported by reasonably equivalent value and consideration. The DIP Facility was negotiated without collusion, in good faith and at arms' length between and among the Debtor and the DIP Lenders.

37.    Most importantly, however, absent the relief sought by the Interim Order pursuant to the DIP Financing Motion, the Debtor's estate will be immediately and irreparably harmed. Consummation of the DIP Facility in accordance with the DIP Loan Documents, and on an emergency, interim basis to the extent provided for herein, is therefore in the best interests of the Debtor and its estate, and is consistent with its fiduciary duties.

**Section 156(c) Application**

38.    Sheppard Mullin and I oversaw the selection of a claim and noticing agent and the Debtor filed a motion (the "**Section 156(c) Application**") contemporaneously herewith to retain

UpShot Services LLC ("**UpShot**"), as claims and noticing agent pursuant to sections 105(a), 156(c), and rule 2002-1(f) of the Local Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**").  Through my experience in chapter 11 cases, I am aware that UpShot is a chapter 11 administrator with significant experience in noticing, claims administration, solicitation, balloting, and other administrative aspects of chapter 11 cases.  Appointing UpShot as the claims and noticing agent in the chapter 11 Case will comply with the local rules for chapter 11 cases of this size, which I understand has approximately 400 potential creditors on the notice list and will relieve the administrative burden on the Clerk of the U.S. Bankruptcy Court for the District of Delaware (the "**Clerk**").

39.    The Debtor's selection of UpShot to act as the claims and noticing agent has complied with the Court's Protocol for the Employment of Claims and Noticing Agents under 28 U.S.C. § 156(c), in that the Debtor has obtained (and I have reviewed engagement proposals from) a minimum of three (3) other court-approved claims and noticing agents to ensure selection through a competitive process.  Moreover, I believe, based on all engagement proposals obtained and reviewed, that UpShot's rates are extremely competitive and reasonable given UpShot's quality of services and expertise.  I have worked with UpShot in other cases and was pleased with their performance.  The Section 156(c) Application pertains only to the work to be performed by UpShot under the Clerk's delegation of duties permitted by Judicial Code Section 156(c) and Local Rule 2002-1(f), and any work to be performed by UpShot outside of this scope is not covered by the Section 156(c) Application or by any order granting approval thereof.  A separate retention application addressing UpShot's services beyond Section 156(c) of the Bankruptcy Code will be filed by the Debtor in the near future if deemed necessary.

**Employee Obligations Motion**

40.     The Debtor has also filed a motion (the "**Employee Obligations Motion**") pursuant to sections 105(a), 363(b), 363(c), 507(a), 541, 1107(a) and 1108 of the Bankruptcy Code and Bankruptcy Rule 6003 seeking the entry of an order authorizing it, in its discretion, to pay, continue or otherwise honor various prepetition employee-related obligations as set forth below (collectively, the "**Pre-petition Employee Obligations**") to or for the benefit of its current employees (the "**Current Employees**") in the first instance, for the payment of certain employment related taxes as "trust fund" taxes secondly, and for the payment of certain prepetition payments owed to former employees (the "**Former Employees**") of the Debtor.

41.     As of the Petition Date, Compressus has ten Current Employees, having laid off approximately ten Former Employees several weeks before the Petition Date.  Through the Employee Obligations Motion, the Debtor seeks the authority, but not the obligation, to make payments on Pre-petition Employee Obligations in the following amounts and order of priority on the bases set forth in the Employee Obligation Motion:

(The remainder of this page is intentionally left blank)

| PAYMENT PRIORITY | DESCRIPTION | ESTIMATED AMOUNT |
|---|---|---|
| Level 1 | Administrative Claims associated with Current Employees (post-petition unpaid amounts) | $38,000 |
| Level 2 | Priority Amounts payable pursuant to 11 U.S.C. §§ 507(a)(4) and 507(a)(5) for each Current Employee ($12,475 x 10) | $124,750 |
| Level 3 | Pre-petition unreimbursed expenses of Current Employees (amount includes Former Employees, but their expenses will be subject to priority level 6 below) | $65,000 |
| Level 4 | Trust Fund Taxes associated with Payroll and other Employee obligations owed as of petition date | $119,000 |
| Level 5 | Priority Amounts payable pursuant to 11 U.S.C. §§ 507(a)(4) and 507(a)(5) for each Former Employee ($12,475 x 10) | $124,750 |
| Level 6 | Pre-petition unreimbursed expenses of Former Employees | Included in Level 3 amount |
| | **ESTIMATED TOTAL** | **$471,500[4]** |

42.     In addition, in the Employee Obligations Motion, the Debtor seeks authority, but not the obligation, to continue to provide its Current Employees with various standard employee benefits, including (a) health, dental and vision coverage, (b) basic term life insurance, (c) 401(k) retirement plans, (d) short-term, long-term disability and accidental death and dismemberment insurance, and (e) workers' compensation (collectively, the "**Employee Benefits**"). The Debtor requests authority (in an abundance of caution and for the purpose of full disclosure) to continue each of the Employee Benefits programs in the ordinary course during the pendency of this chapter 11 case in the manner and to the extent that such programs were in effect immediately prior to Petition Date and to make payments in connection with expenses incurred in the post-petition administration of any Employee program. The Debtor does not at this time seek any authority to

---

[4] Because of the Debtor's lack of cash, the relief requested in the Employee Obligations Motion is wholly dependent on the Court's approval, on an interim and final basis, of the Debtor's DIP Financing Motion. Specifically, the Debtor intends to pay certain of the amounts listed herein upon interim approval of the DIP Motion in the order of the priority provided for herein, but will endeavor to pay certain other amounts upon final approval of the DIP Financing Motion and provided that further financing is made available pursuant thereto.

pay any pre-petition amounts which may be outstanding in connection with such Employee Benefits programs.

43.    As mentioned above, the Employee Obligations Motion also seeks authorization for the Debtor to pay any and all local, state and federal withholding and payroll-related or similar taxes relating to the Employees including, but not limited to, all withholding taxes, social security taxes and other governmental withholding obligations as "trust fund" taxes (the "**Trust Fund Taxes**").  In the Employee Obligations Motion, the Debtor asserts, among other things, that these Trust Fund Taxes do not comprise part of the Debtor's estate and, therefore, must be paid over to the appropriate taxing authorities by law.

44.    I believe that the Debtor's ability to successfully maximize the value of the assets is dependent on the expertise and continued dedication and service of the Current Employees who have unique knowledge about the Debtor and its industry.  Any attempt to replace the Employees would be costly, time consuming and would hinder the Debtor's chapter 11 case.

45.    In addition, applicable law supports and requires in certain cases, the payment of each of the Pre-petition Employee Obligations.  Therefore, I believe that relief requested herein is in the best interests of its estate, the Debtor's creditors and other stakeholders.

**Motion to Extend Time to File Schedules and Statements**

46.    The Debtor has filed a motion (the "**Extension Motion**") to extend the time within which it shall file its (A) schedules of assets and liabilities, (B) schedule of current income and expenditures, (C) schedule of executory contracts and unexpired leases, (D) statement of financial affairs (the "**Schedules and Statements**") required under Bankruptcy Rule 1007(b).  In the Extension Motion, the Debtor requests that the Court extend the period by which it must file its Schedules and Statements through and including May 13, 2015, which is forty-five (45) days from

the Petition Date and fifteen (15) days from the deadline provided by Local Rule 1007-1(b), without prejudice to the Debtor's ability to request additional time should it become necessary.

47.    The Debtor states in the Extension Motion that good and sufficient cause exists for granting the Debtor additional time to file its Schedules and Statements based on the facts I have outlined in Part I of this Declaration and, specifically, the fact that the Debtor filed this case on an emergency basis and without having previously engaged its current bankruptcy professionals for any meaningful amount of time prior to the Petition Date and, in the case of my firm, until eight days after the commencement of the case. I was not onsite at the Debtor's headquarters until the morning of day 9. Provided that the post-petition financing motion is approved, I believe that the Debtor will be able to successfully complete the Schedules and Statements by May 13, 2015, given that my firm is now on the ground with the Debtor on a daily basis and that the professionals will only need to prepare Schedules and Statements with respect to a single Debtor.

48.    I believe that if the Court grants the relief requested in each of the First Day Motions, the prospect for achieving these objectives and completing a successful, efficient and timely sale of the Debtor's assets for the benefit of all of the Debtor's creditors will be substantially enhanced.

## CONCLUSION

49.    I hereby certify that the foregoing statements are true and correct to the best of my knowledge, information and belief, and respectfully request that all of the relief requested in the First Day Motions be granted, together with such other and further relief as is just and proper.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 13th day of April, 2015.

Compressus, Inc.
*Debtor and Debtor in Possession*

Wayne P. Weitz
Financial Advisor